# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

JOE CECIL HOLDEN,               )
                                           )

                **Plaintiff,**          )
                                           )

**v.**                                 )      **Case No. 11-CV-096-PJC**
                                           )

**MICHAEL J. ASTRUE, Commissioner of the**   )
**Social Security Administration,**            )
                                         )

                **Defendant.**           )

## OPINION AND ORDER

Claimant, Joe Cecil Holden ("Holden"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Holden appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Holden was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## Claimant's Background

Holden was 49 years old at the time of the hearing before the ALJ on February 8, 2010. (R. 23). Holden testified that he left school prior to completing 10th grade. Holden was enrolled in special education classes in school and said he still had difficulty with reading and writing. (R. 28, 31). Holden previously worked as a construction laborer. (R. 26, 31-32). Holden said that the main reason he quit working was because he was no longer physically able to do

construction work. (R. 26, 28). He said that he was unable to lift the heavy construction material. (R. 26, 31). The last job he had involved shoveling a ditch by hand. (R. 31). He said that he quit because he was no longer able to physically handle the work or the heat. (R. 28). At the time of the hearing, Holden lived with his elderly mother. (R. 27-28).

Holden testified that he suffered from low back pain, leg pain, knee pain, arm and hand numbness, and shortness of breath. (R. 26-27, 29-30, 32). He also suffered from Hepatitis C and had a history of high blood pressure. (R. 26-27). Holden said he experienced daily knee pain, which reportedly began a few years prior to the hearing. (R. 30). He also said that he experienced numbness in his left arm and left hand several times throughout the day, for 2 or 3 years before the hearing. (R. 30, 32). Holden testified that for several years, he experienced shortness of breath on a daily basis. (R. 29). He said that he would become short of breath with exertion and with sitting. *Id.*

After his Hepatitis C diagnosis, Holden received treatment consisting of a series of three shots. (R. 26, 29-30). He was unable to receive any further treatment because he had no health insurance and could not afford it. (R. 30). He had not sought treatment for his back or breathing problems. (R. 29). Prior to being diagnosed with Hepatitis C, Holden drank 12 to 24 beers per day, but had since reduced the amount of drinking to six beers per week. (R. 27).

Regarding his physical limitations, Holden said he was able to stand for only 20 minutes at a time because of the pain in his back and legs. (R. 29). He testified his ability to sit was likewise limited to 20 minutes because of back and leg pain. *Id.* He later said that he would be able to sit for no more than one hour in an eight hour work day and would have to move around every hour. (R. 31). During the hearing itself, Holden asked the ALJ for permission to stand. (R. 34). He testified he was limited to lifting and carrying ten pounds. (R. 32). He said he dropped things from his left hand because of chronic numbness. (R. 30, 32).

Holden was treated by Bill Evans, PA, ("Evans") from 2002-2008. (R. 215-29). In 2002, Holden was seen by Evans for abscessed gums and was treated with antibiotics and pain medication. (R. 223). Holden's recorded blood pressure was 138/84.[1] *Id.*

On September 25, 2003, Holden was seen at Evans' clinic for symptoms of bronchitis. (R. 229). Holden was given an antibiotic prescription and told to stop smoking. *Id.*

On October 4, 2004, the records reflect that Holden reported that he was having trouble coping after the death of his father. *Id.* Holden was prescribed Xanax. *Id.*

Holden presented to the emergency room at Okmulgee Memorial Hospital on October 30, 2004, with left shoulder pain he sustained from a fall. (R. 289-97). Holden had decreased range of motion in his shoulder and experienced chest pain with movement. (R. 290-91, 293). A chest x-ray showed Holden's lungs were hyperexpanded and that he had some chronic interstitial change present. (R. 295). The x-ray of his shoulder was normal. (R. 296). Holden was prescribed pain medication and a muscle relaxer and instructed to follow up with Evans. (R. 294, 297). At the hospital, an unidentified family member/spouse also reported Holden had been having trouble sleeping because of his father's death. (R. 289).

At Holden's appointment with Evans on April 10, 2007, Holden's blood pressure was 203/113. (R. 222). Evans diagnosed Holden with alcohol abuse and essential hypertension. *Id.* Holden was given a prescription for blood pressure medication. *Id.* When Evans rechecked Holden on April 25, 2007, he additionally diagnosed Holden with hypercholesterolemia.[2] (R. 219). On that date, Holden's blood pressure was 178/104. *Id.*

---

[1] Normal blood pressure is in the recorded range of 120/80, which indicates systolic pressure of 120 and diastolic pressure of 80. Taber's Cyclopedic Medical Dictionary 243-44 (17th ed. 1993).

[2] Hypercholesterolemia occurs when there is too much cholesterol or fat particles in the blood. Taber's at 932.

On May 15, 2007, Holden presented to St. John Sapulpa's emergency room complaining of nausea, vomiting and dizziness. (R. 262, 270). He stated his symptoms began the day before when he was working outside in hot weather, and he became dizzy and unable to stand. *Id*. He reported that he had been diagnosed with hypertension in 1997, but did not take his medication regularly because of the expense. (R. 270). Holden said that he smoked 2 packs of cigarettes per day, and that he routinely drank 12-24 beers per day. (R. 270-71). He was diagnosed with severe hyponatremia[3] and was admitted to acute care. (R. 262, 265, 273). He was additionally diagnosed with alcohol abuse, poorly controlled hypertension and tobaccoism. (R. 273). A CT of his chest revealed:

(1) Right middle lobe infiltrates, possibly pneumonia, correlate with symptoms.
(2) Sclerotic lesion in the lower thoracic spine, most likely a bone island.
(3) Enlarged mediastinal nodes as well as borderline sized hilar lymph nodes. If patient has no underlying malignancy, close follow-up recommended.

(R. 263, 280). Holden was given intravenous ("IV") fluids, the antibiotic Levaquin, and Librium to control symptoms of alcohol withdrawal. (R. 263, 269). Holden's sodium level increased during the course of his hospital stay and he was discharged on May 17, 2007. (R. 262-63).

Holden was seen by Evans for a follow-up of his hyponatremia on May 23, 2007. (R. 218). His blood pressure was recorded at 176/99 and 158/96. *Id*. Holden was prescribed blood pressure medications. *Id.*

Holden presented to the emergency room of St. John Sapulpa on October 15, 2007 for an injury to his left hand. (R. 281-87). Impressions from an x-ray of his wrist were unremarkable. (R. 283, 287). He was diagnosed with tendinitis. (R. 283).

On October 30, 2007 and May 8, 2008, Holden had appointments with Evans to monitor

---

[3] Hyponatremia is a decreased concentration of sodium in the blood. Taber's at 949.

him for symptoms related to hypertension and alcohol abuse. (R. 216-17). His recorded blood pressure was 175/107 and 140/89 on those respective dates. *Id*. Holden continued to be prescribed medications to control his blood pressure. *Id.*

On June 25, 2008, Holden presented to the emergency room at Saint Francis Hospital South for complaints of abdominal and chest pain. (R. 189-213 ). Holden reported that his abdomen had been swollen for two days. (R. 190). Blood work showed that he was positive for Hepatitis C. (R. 199, 208). A drug screen showed he tested positive for multiple substances, including benzodiazepines, cannabinoids, and opiates. (R. 198, 207, 211). Chest x-rays revealed some hyperinflation of the lungs, osteopenia,[4] and mild degenerative changes in the thoracic spine. (R. 213). He was discharged with diagnoses of abdominal pain, alcohol abuse, polysubstance abuse, hyponatremia, chest pain, and hypertension. (189, 192).

Holden phoned Evans on July 1 and July 2, 2008, seeking a refill of Librium to help him quit drinking. (R. 215). The record reflects that Evans would not refill the medication, but suggested that Holden be seen for evaluation. *Id.*

When Holden was seen at the Community Health Service Clinic ("Clinic") on October 31, 2008, his blood pressure was 144/86. (R. 299, 301). Holden reported that he continued to drink alcohol and smoke cigarettes. (R. 300). He was given a refill of his blood pressure prescriptions. (R. 300-01). Holden was seen again at the Clinic on May 1, 2009 for a blood pressure check and prescription refill. (R. 302-03). His blood pressure on that date was 120/80. (R. 299, 303).

After the ALJ rendered his decision, Holden was admitted to St. John Medical Center on

---

[4] Osteopenia is "reduced bone mass due to a decrease in the rate of osteoid synthesis to a level insufficient to compensate normal bone lysis. The term is also used to refer to any decrease in bone mass below the normal." Dorland's Illustrated Medical Dictionary 1289 (29th ed).

April 5, 2010 for empyema[5] and recurrent pneumonia. (R. 306-43).[6] Holden reported that he had experienced difficulty breathing for a duration of four weeks. (R. 313). On exhalation, Holden's breathing was consistent with chronic obstructive pulmonary disease ("COPD"). (R. 310). It was also noted that radiographic changes were consistent with emphysema. (R. 316). Holden's medical comorbidities were listed as hypertension, coronary artery disease, COPD, and anxiety. *Id.* Chest tubes were placed in his lungs to drain fluid from the empyema. (R. 307). A CT scan revealed some lymphadenopathy.[7] (R. 308, 335). He was started on IV antibiotics and given breathing treatments for dyspnea.[8] (R. 311). He was discharged in stable condition on April 19, 2010. (R. 307-08). The discharge summary recommended Holden have another chest CT performed within 6 weeks to rule out concern of lymphadenopathy malignancy. *Id.* However, it was noted that it would "be exceptionally difficult for him to obtain [the repeat CT] given that he is uninsured." (R. 317).

On September 8, 2010, Holden presented to the emergency room of St. John Sapulpa in mild distress, with complaints of intermittent chest pain, shortness of breath, dizziness, nausea, diarrhea, and vomiting. (R. 378-85). Holden had not obtained the recommended follow-up

---

[5] Empyema is a collection of pus in the pleural cavity, which is usually caused by an infection in the lungs. Taber's at 632.

[6] This Court has included all evidence submitted subsequent to the ALJ's decision in its consideration of whether substantial evidence supports the ALJ's determinations. "We must [ ] consider the entire record, including [the newly submitted] treatment records, in conducting our review for substantial evidence on the issues presented." *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006).

[7] Lymphadenopathy is a term meaning "disease of the lymph nodes." Taber's at 1141.

[8] Dyspnea is "air hunger resulting in labored or difficult breathing, sometimes accompanied by pain." Taber's at 593.

chest CT scan because he was uninsured.  (R. 346, 352, 380).  A chest x-ray indicated left lower lobe atelectasis,[9] probable post-obstructive changes, and a possibly enlarging lymph node.  (R. 383-84).  His EKG results were abnormal, with possible left atrial enlargement, incomplete right bundle branch block, and the results could not rule out anterior infarction.  (R. 385).  The doctors diagnosed him with severe hyponatremia and dyspnea.  (R. 345, 384).  He was transferred the following day to St. John Medical Center in Tulsa.  (R. 345-76).  He was admitted to the hospital's intensive care unit for low sodium correction.  (R. 351).

During Holden's hospital stay, a chest x-ray and chest CT scan found abnormalities in his right lung.  (R. 369-71).  In comparison to the April 19, 2010 study, the report stated there was a reduction in the previous probable malignant pleural complex, an increasing infiltrate in the right lobe, an increase in size of the right paratracheal node, and a decrease in size of subcarinal adenopathy and the right hilar mass.  (R. 369).  Doctors suspected the fluid was residual empyema, a successful aspiration was performed to drain the fluid from Holden's lung. (R. 369-70).  Holden was discharged on September 13, 2010, in stable condition with oral antibiotics. (R. 346).  He was to receive close monitoring at the University of Oklahoma Clinic and have a follow-up chest CT in one month.  *Id.*

Agency consultant Joel Justin Hopper, D.O., conducted an examination of Holden on September 22, 2008.  (R. 232-38).  Holden reported that he experienced low back pain with radiation into his right leg down to his right foot.  (R. 232).  He said his right foot felt like it was asleep.  *Id.*  He reported that he had increased difficulty with lifting, bending and stooping.  *Id.* He said that he could walk ½ to one block before he had to take a break because of his back pain. *Id.*  Holden told Dr. Hopper that he stopped working in June 2008 when his coworkers no longer

_____

[9] Atelectasis indicates an incomplete expansion or collapse of a lung.  Dorland's at 166.

wanted to work with him when they learned of his Hepatitis C diagnosis. *Id*.

During Dr. Hopper's physical examination, he found that Holden had pain and limited range of motion in the lumbosacral spine. (R. 234). Range of motion scores were: flexion 60/90; extension 20/25; left bend 20/25; and right bend 20/25. (R. 234-35). Dr. Hopper noted that Holden moved around the room freely, but he observed that Holden had weak toe and heel walking on the right side. (R. 233-34). On the evaluation sheet, Dr. Hopper noted straight leg raises were positive on the right side when sitting and lying. (R. 234). However, in contradiction to the evaluation sheet, in Dr. Hopper's summary report, he noted the straight leg raises were negative bilaterally. (R. 233). Dr. Hopper also noted that Holden experienced pain that he described as 15-20 minutes of pressure at an intensity of 8/10 in his mid-sternal chest. (R. 238). He wrote that it was "unknown" what precipitated Holden's chest pain, but added that rest gave Holden relief. *Id*. It was Dr. Hopper's impression that Holden had Hepatitis C, hypertension, depression, and low back pain with right-sided paresthesia.[10] (R. 233). Dr. Hopper added that he was unable to rule out lumbar disc pathology. *Id*.

Luther Woodcock, M.D., a nonexamining agency consultant, completed a Physical Residual Functional Capacity assessment on October 8, 2008. (R. 253-60). Dr. Woodcock did not have access to a treating or examining source statement regarding Holden's physical capacities. (R. 259). Dr. Woodcock indicated that Holden could lift and carry 20 pounds occasionally and 10 pounds frequently. (R. 254). He found that Holden could stand or walk for 6 hours in an 8-hour workday, and he could sit for 6 hours in an 8-hour workday. *Id*. In evaluating further, Dr. Woodcock found that Holden had no postural or manipulative limitations.

---

[10] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." Dorland's at 1324.

(R. 255-56).  He also marked that Holden had no environmental limitations.  (R. 257).   In the portion of the form calling for narrative explanation of these findings, Dr. Woodcock stated that Holden, diagnosed with Hepatitis C, had not undergone a biopsy.  (R. 254).  He noted that at Holden's recent examination[11], his abdomen was soft and round, with no evidence of organomegaly.[12]  *Id.*  He noted that while Holden had some limitation in flexion and extension in his back, his range of motion was otherwise normal.  *Id.*  Dr. Woodcock also noted there was no evidence of a neurological problem.  *Id.*  He commented that the RFC was based on fatigue and weakness that would be expected based on his diagnoses.  *Id.*

Nonexamining agency consultant Tom Shadid, Ph.D., completed a Psychiatric Review Technique ("PRT") form on October 7, 2008.  (R. 239-52).  He  indicated that Holden's mental impairments were not severe.  (R. 239).  Dr. Shadid marked that Holden had an affective disorder and met the criteria for depression, not otherwise specified.  (R. 239, 242).  For the "Paragraph B Criteria,"[13] Dr. Shadid found mild limitation of Holden's activities of daily living and mild difficulty in maintaining concentration, persistence, or pace.  (R. 249).  He noted that Holden had no difficulties in maintaining social functioning.  *Id.*  Dr. Shadid marked that there was insufficient evidence regarding episodes of decompensation.  *Id.*  In the "Consultant's

_____

[11] Dr. Woodcock does not specifically refer to Dr. Hopper's report, but it is clear from his comments that he reviewed and relied upon Dr. Hopper's report and examination of Holden.

[12] Organomegaly, also called visceromegaly, is an enlargement of a large interior organ. Dorland's at 1972-73.

[13] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Notes" portion of his report, Dr. Shadid wrote that Holden, 47 years old, had complaints of Hepatitis C, anxiety, and being "stressed out." (R. 251). Dr. Shadid stated that Holden had not received mental health treatment and added that his psychiatric problems appeared to be related to his physical problems and domestic issues. *Id*. He stated that Holden's records indicated potential chemical abuse. *Id*. Dr. Shadid noted that Holden's activities of daily living were limited due to his physical problems. *Id*. It was further noted the field office representative had not made notation of mental problems during the face-to-face interview with Holden. *Id*.

## Procedural History

Holden filed an application on July 2, 2008, seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 115-17). The application was denied initially on October 7, 2008 and upon reconsideration on November 20, 2008. (R. 36-37). A hearing before ALJ John Volz was held February 8, 2010 in Tulsa, Oklahoma. (R. 23-35). By decision dated February 22, 2010, the ALJ found that Holden was not disabled. (R. 14-22). On November 15, 2010 and December 17, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-8). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[14]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Id.*

      Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether  the decision was

supported by substantial evidence; and, second, whether  the correct legal standards were

applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

      Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from

its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The

court "may neither reweigh the evidence nor substitute" its discretion for that of the

Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

_____

[14] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520©.  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further  inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

The ALJ made his decision at Step Five of the evaluation process. At Step One, the ALJ found the Holden had not engaged in substantial gainful activity since his application date of July 1, 2008. (R. 19). At Step Two, the ALJ found that Holden had severe impairments of Hepatitis C and low back pain with right-sided paresthesia. *Id.* At Step Three, the ALJ found that Holden's impairments, or combination of impairments, did not meet any Listing. *Id.*

After reviewing the record, the ALJ determined Holden had the RFC to perform a full range of light work. (R. 20). At Step Four, the ALJ found that Holden was not capable of performing past relevant work. (R. 21). At Step Five, the ALJ found that there were jobs in significant numbers in the economy that Holden could perform, taking into account his age, education, work experience and RFC. (R. 21-22). Therefore, the ALJ found that Holden was not disabled from July 1, 2008 through the date of his decision. (R. 22).

**Review**

Holden asserts that the ALJ erred by failing to properly consider and evaluate medical source evidence, failing to perform a proper Step Five determination, and failing to perform a proper credibility determination. Regarding the issues raised by Holden, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

**Medical Source Evidence**

For purposes of determining whether Holden was disabled, the relevant time period is July 2, 2008 through February 22, 2010, the date of the ALJ's decision. In finding that Holden was not disabled during that time, the ALJ considered Holden's subjective complaints, reviewed

12

the available medical records,[15] and took into consideration Dr. Hopper's evaluation and Dr. Woodcock's assessment. (R. 19-21). Specifically, the ALJ based his decision on Holden's sparse medical records and lack of opinion evidence regarding Holden's ability to work or concern regarding Holden's impairments. (R. 21). In discussing Dr. Hopper's evaluation, the ALJ noted that Holden was able to move all extremities well, had no difficulty with finger manipulation, had a strong grip, had negative straight leg raises, had two-thirds of the maximum flexion in his lumbar spine, and otherwise had normal range of motion. *Id*. Although the ALJ did not expressly discuss Dr. Woodcock's assessment of Holden's RFC, it is evident he considered it, as it closely mirrored the hypothetical posed at the administrative hearing and was consistent with his ultimate RFC determination. *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988) (decision as a whole can reflect consideration of evidence even when not expressly referenced); *Emarthle v. Apfel*, 166 F.3d 647, 1988 WL 892304, at *2 (10th Cir. 1998) (unpublished).

Holden argues the ALJ highlighted only evidence supporting the unfavorable decision and did not discuss evidence supporting Holden's claim of disability. It is oft-stated law in this circuit that an ALJ must discuss more than just the evidence favorable to an opinion that a claimant is not disabled:

---

[15] In the section of his Brief discussing medical source evidence, Holden begins by arguing that the ALJ did not take into consideration Holden's alleged inability to obtain medical treatment because he had no insurance and limited financial means. Opening Brief, Dkt. # 12, pp. 2-3. This argument does not relate to the ALJ's alleged failure to properly consider the evidence, but is an argument that goes towards Holden's credibility. *See, e.g., Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000) (considering failure to follow treatment as part of credibility determination); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (ALJ may rely on failure to pursue treatment in noncredibility determination); *Frey v. Bowen*, 816 F.2d 508, 516 (10th Cir. 1987) (failure to take pain medication goes to credibility assessment). Accordingly, this argument is addressed below, in assessing Holden's credibility argument.

> [I]n addition to discussing the evidence supporting his decision, the ALJ also
> must discuss the uncontroverted evidence he chooses not to rely upon, as well as
> significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). It is error to ignore evidence that would

support a finding of disability while highlighting the evidence that favors a finding of

nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007). A bare conclusion,

without discussion, is beyond meaningful judicial review, and therefore an ALJ is required to

discuss the evidence and give reasons for the determinations made in his decision. *Clifton*, 79

F.3d at 1009.

Here, the only examples Holden provides of what evidence should have been, but was

not, considered by the ALJ, are specific excerpts from Dr. Hopper's consultative report. In his

decision, the ALJ did discuss Dr. Hopper's report, but Holden complains that the ALJ did not

discuss certain portions of the report. Specifically, Holden states the ALJ ignored Dr. Hopper's

assessment of hypertension and depression, ignored a finding of weak toe and heel walking on

the right side, and ignored that Holden experienced pain with range of motion testing. Although

it would have been better if the ALJ had discussed Dr. Hopper's report in more detail, the ALJ is

not required "to discuss every piece of evidence." *Frantz*, 509 F.3d at 1303; *Lauxman v. Astrue*,

321 Fed. Appx. 766, 768-69 (10th Cir. 2009) (unpublished) (while "it would have been helpful if

the ALJ had elaborated" on his analysis of the opinion evidence, his decision was adequate).

With regards to Dr. Hopper's assessment of hypertension and depression, Holden has not

argued or produced evidence that either of these produce functional limitations. *Howard v.

Barnhart*, 379 F.3d 945, 947-48 (10th Cir. 2004) (claimant bears the burden of proving

functional limitations). The mere presence of a condition, without any demonstrable work-

related limitations, will not support a disability claim. *Hinkle v. Apfel,* 132 F.3d 1349, 1352

(10th Cir. 1997) (*citing Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)); *Bernal v. Bowen*, 851 F.2d

297, 301 (10th Cir. 1988) (a diagnosis does not "automatically mean" that a claimant is disabled). Indeed, Holden did not even testify regarding any functional limitations from his hypertension or depression. Nor was there opinion evidence[16] from any treating physician regarding functional limitations resulting from depression or hypertension. Similarly, it is inconsequential that the ALJ did not specifically mention Dr. Hopper's notations of weak toe and heel walking on the right side or pain with range of motion testing. As evidenced in his Step Two determination, where the ALJ found Holden's lower back pain with right-sided paresthesia was a severe impairment, the ALJ did adopt Dr. Hopper's overall findings, as that diagnosis is directly from Dr. Hopper's report and nowhere else in Holden's medical records. (R. 19, 233). There is no evidence that the more specific notations impact Holden's ability to perform work-related activities. *See Wyatt v. Barnhart*, 190 Fed. Appx. 730, 734 (10th Cir. 2006) (unpublished) (substantial evidence supported RFC determination of light work despite consultant report indicating weak heel/toe walking and positive straight leg raises). The undersigned finds no error in the ALJ's omission of these conditions from his discussion of Dr. Hopper's report. *See Howard*, 379 F.3d at 947 ("When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened.").

Holden also argues the ALJ mischaracterized the evidence by noting negative straight leg raises, as indicated by Dr. Hopper's narrative report, when the report's attached sheet noted positive straight leg raises on the right side. (R. 21, 233-34). It is true there is an inconsistency,

---

[16] A "true medical opinion" is one that contains a doctor's judgment about the nature and severity of a claimant's physical limitations, information about what activities the claimant is capable of performing, or information regarding the claimant's specific limitations. *Cowan v. Astrue*, 552 F.3d 1182, 1188-89 (10th Cir. 2008).

but the fact that there is an inconsistency does not *per se* make the ALJ's decision unsupported by substantial evidence. Under the circumstances of this case, that one inconsistency does not demonstrate objective evidence of functional limitations or that the straight leg raise was a major factor that the ALJ relied upon in assessing Holden's credibility or in weighing the medical opinion evidence. This minor error does not "undermine confidence in the determination of this case." *Gay v. Sullivan*, 986 F.2d 1336, 1341 n.3 (10th Cir. 1993); *Whitney v. Barnhart*, 60 Fed. Appx. 266, 268 n.1 (10th Cir. 2003) (unpublished) (inconsistency in the ALJ's reference to examination was not material).

The undersigned finds the discussion of Dr. Hopper's report was sufficient. *See Wall v. Astrue*, 561 F.3d 1048, 1068 (10th Cir. 2009) (generalized explanation may be sufficient). The ALJ did not commit any reversible error in his consideration of the medical evidence.

**Step Five Finding**

The ALJ found that Holden had the RFC to perform a full range of light work. (R. 20). The exertional requirements of light work are defined at 20 C.F.R. § 416.967(b). This RFC is consistent with and supported by the assessment completed by Dr. Woodcock, which was based, in part, on Dr. Hopper's evaluation. (R. 21, 253-60). The undersigned finds this is substantial evidence supporting the ALJ's determination of Holden's RFC, and therefore his Step Five finding.

The arguments of Holden regarding Step Five are rather scattered and disjointed. This section of his brief is less than two pages long and Holden strings together several sentences that appear to make distinct, but undeveloped, arguments regarding errors of the ALJ at Step Five. Plaintiff's Opening Brief, Dkt. #12, pp. 3-5. For example, Holden begins this section by stating that the ALJ did not consider all of his impairments and by listing numerous impairments he believes should have been included. Holden's arguments are misplaced because impairments are

16

not included in the RFC determination; instead, the functional limitations from the impairments are what constitute the ALJ's RFC determination.  SSR 96-8p, at *1.  Holden then states the testimony of the vocational expert ("VE") was unreliable and states the ALJ's hypothetical was incomplete.  This entire section of Holden's brief makes various incomplete arguments, and the lack of development and lack of a transition between the arguments makes any meaningful analysis by this reviewing Court difficult.

In a 2009 case, the Tenth Circuit, discussing an argument related to the claimant's RFC, noted that the claimant had merely alleged several times at the district court level, that the ALJ had failed to consider the objective medical evidence.  *Wall*, 561 F.3d at 1066.  The Tenth Circuit stated that "[b]ecause Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived."  *Id.*  The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue.  *Id.*  (quotation and citation omitted).  Here, the undersigned finds that Holden's arguments in the section of his brief related to Step Five are perfunctory and undeveloped to the point that this Court cannot give them meaningful review, and therefore, pursuant to *Wall,* a finding that these arguments have been waived is appropriate.

Even absent a finding of waiver, the Court would conclude that the ALJ's decision is adequate and that Holden's arguments are unpersuasive.  Although Holden states his argument as error in the hypothetical given to the VE, it is more properly viewed as an attack on the ALJ's RFC determination.  Holden argues the ALJ did not consider all of his impairments in determining his RFC, claiming that the ALJ should have imposed environmental and postural limitations.  In assessing the claimant's RFC, the ALJ is obligated to consider all impairments, severe and non-severe. 20 C.F.R. § 416.945(a)(2) ("We will consider all of your medically

determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe' . . . when we assess your [RFC]").  In the instant case, the ALJ considered Holden's severe impairments of Hepatitis C and low back pain with right sided paresthesia.  (R. 19-21).  He reviewed Holden's testimony regarding his pain, shortness of breath, physical limitations, and explanation of why he was unable to work.  (R. 20).  As discussed in more depth below, the ALJ gave a sufficiently detailed analysis for why he did not find Holden's complaints of disabling pain to be credible.  (R. 21).

First, as to Holden's complaints of shortness of breath and his belief that the RFC should have included environmental restrictions, Holden cites to no objective medical evidence from the relevant time period of July 1, 2008, when he applied for benefits, to February 22, 2010, when the ALJ rendered his decision.  Holden relies solely on medical records related to treatment provided after February 22, 2010.  Although newly submitted evidence can, in certain circumstances, establish disability, the evidence must be related to the relevant period of time.  *Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991).  The ALJ did take into consideration Holden's subjective complaints of shortness of breath.  (R. 20).  The evidence Holden relies upon pertains to treatment provided after the ALJ's decision, in April 2010, for an isolated empyema and pneumonia.  (R. 309-18).  Moreover, the shortness of breath symptoms reported by Holden in  April 2010 and September 2010 were of recent onset (three weeks or less).  (R. 309, 313, 379).

Although COPD is documented in these later medical records, there is no indication that this diagnosis would limit Holden's RFC beyond the light work found by the ALJ.  The records reflect Holden was "not historically on outpatient therapy for [COPD] and does not exhibit findings of acute COPD exacerbation at this time," and although his exhalation was "consistent with COPD," his "respiratory effort [was] regular and unlabored." (R. 310, 316).  Furthermore,

the identification of COPD and coronary artery disease were new diagnoses after the relevant time period had closed and there is no evidence that they were related to any documented chronic condition that was in existence and being treated during the relevant period. As the Tenth Circuit has stated, a finding of disability cannot be based solely upon a retrospective diagnosis and subjective testimony; there must also be evidence that the claimant was actually *disabled* during the relevant time. *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). Holden cites to no objective medical evidence, opinion evidence, or authority that would support his argument the RFC should have included environmental restrictions. Substantial evidence supports the ALJ's omission of environmental restrictions from Holden's RFC. *Dean v. Chater*, 94 F.3d 655 *2 (10th Cir. 1996) (unpublished) (Secretary did not err in finding the RFC was not restricted by mild COPD diagnosis when there was no medical evidence indicating activities were limited by shortness of breath).

Similarly, the undersigned finds no error in the ALJ's omission of limitations for Holden's complaints of anxiety and depression.[17] Once again, Holden relies upon Dr. Hopper's

---

[17] Holden makes numerous arguments throughout his brief of certain things he believes should have been mentioned or discussed in the ALJ's decision. Judicial review is limited to the reasons stated in the ALJ's decision. *Carpenter*, 537 F.3d at 1267. However, the Court believes that the ALJ's failure to discuss certain evidence, including Holden's complaints of anxiety and depression, is analogous to the failure of the ALJ to discuss the claimant's cardiac problems in *Big Pond v. Astrue*, 280 Fed. Appx. 716, 719 n.2 (10th Cir. 2008) (unpublished). The Tenth Circuit rejected an argument that the Commissioner engaged in *post hoc* justification of the ALJ's decision when the issue raised by the claimant was that the ALJ had failed to discuss her cardiac problems:

> We have simply reviewed the record in order to determine whether, and then to illustrate why, the ALJ's omissions were not legal error. The ALJ was not required to provide grounds in the decision for failing to do what was not required. Thus, neither we nor the Commissioner have relied on a substitute rationale for upholding the ALJ's decision.

*Id.*

report and on medical records dated after the ALJ's decision. (R. 233, 316, 353). Notably, these three records have no discussion of Holden's alleged symptoms or condition, with only the single words of "depression" or "anxiety" listed. *Id*. There is no true opinion evidence as contemplated by Social Security regulations discussing the nature and severity of functional limitations. *Cowan*, 552 F.3d at 1188-89. Indeed, these one-word notations may reflect nothing more than Holden's own subjective complaints. At most, these scanty references in no way indicate functional limitations. The PRT completed by Dr. Shadid indicated that Holden's depression was non-severe and caused minimal functional limitations. (R. 239-51). Accordingly, substantial evidence supports the omission of any mental limitation from the ALJ's RFC determination.

The remainder of Holden's argument regarding limitations that should have been included in his RFC determination are based on his subjective complaints of abdominal pain, leg pain and numbness, knee pain, and left arm/hand pain and numbness. Based upon these subjective complaints, Holden urges postural limitations preclude the ALJ's determination that he could perform light work. The ALJ specifically considered all of these complaints in his decision. (R. 20-21). There is no reason to conclude that the ALJ did not take these complaints into account when he formulated Holden's RFC, and there is no opinion evidence indicating that Holden needed postural limitations. The undersigned finds no error in the ALJ's omission of postural limitations in the RFC.

Holden also complains of the incompleteness of the ALJ's hypothetical and the reliability of the VE's testimony. At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account his age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999). The ALJ is allowed to make this required showing through the testimony of a VE. *Id.* at

1089. Holden argues that the VE's testimony was unreliable because the jobs identified by the VE would require frequent reaching, handling, and fingering, and because it was unclear whether the jobs could be performed with a sit/stand option. The Commissioner argues this argument is irrelevant as the ALJ was not required to use a VE because the ALJ properly applied the Grids. The undersigned agrees VE testimony was not necessary, but even if VE testimony was required, there was no error.

The Grids are based on the four relevant factors contained in the Social Security Act: physical ability, age, education, and work experience. They provide a "shortcut" of rules that determine whether jobs exist in significant numbers that a claimant with certain characteristics can perform. *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir.1995). However, when the RFC contains exertional limitations so that the claimant does not have the ability to perform all of the exertional requirements of the job category, the Grids cannot be used at Step Five. *See* Social Security Ruling 83-11, 1983 WL 31252 at *2 (the RFC required for the Grids "reflects an exertional capability sufficient to allow performance of substantially all of the primary strength activities required in the range of work existing at the specified level"); *Allen v. Barnhart*, 357 F.3d 1140, 1142-43 (10th Cir. 2004). Here, the ALJ determined Holden was able to perform the full range of light work. Therefore, use of the Grids is proper, and VE testimony is not required. *Thompson*, 987 F.2d at 1488 (reliance on the grids is not precluded by mere presence of nonexertional impairment); *Gossett v. Bowen*, 862 F.2d 802, 806 (10th Cir. 1989) ("Automatic application of the grids is appropriate only when a claimant's RFC, age, work experience, and education precisely match a grid category").

Even if the Court believed VE testimony was required, Holden's arguments are unpersuasive. Hypothetical questions to the VE must include all limitations found by the ALJ in

the RFC determination, but here, the hypothetical was actually more restrictive than the RFC

determination, as it was a slightly-modified light exertional level. (R. 20, 33). *See Darland v.

Shalala*, 52 F.3d 337 *2 (10th Cir. 1995) (unpublished) (VE testimony regarding sedentary jobs

alone was substantial evidence supporting ALJ's Step Five determination, and therefore court

did not need to address whether RFC that included light work was in error). The ALJ's RFC did

not include reaching, handling, or fingering limitations, nor did it include a sit/stand option. (R.

20). It was Holden's counsel, not the ALJ, that inquired into these additional limitations. (R.

34-35). Given the supported finding of the ALJ that Holden was not fully credible, it was not

error for the ALJ to omit these restrictions, which were inquired into only by counsel. *See

Barrett v. Astrue*, 340 Fed. Appx. 481, 488 (10th Cir. 2009) (unpublished) (testimony of VE

regarding limitations that were not ultimately included in the ALJ's RFC was irrelevant);

*Roulston v. Shalala*, 46 F.3d 1152 *1, 1995 WL 41671 (10th Cir. 1995) (unpublished) (VE's

favorable responses elicited by claimant's attorney and based on subjective complaints that the

ALJ ultimately found not credible were not binding). The VE's testimony remains substantial

evidence supporting the ALJ's Step Five finding.

Holden also complains that the ALJ did not ask the VE to explain any conflicts with the

Dictionary of Occupational Titles (the "DOT"). In *Haddock*, the Tenth Circuit ruled that an ALJ

must elicit testimony from a VE regarding whether the VE's testimony conflicts with the DOT.

196 F.3d at 1089-92. If there is a conflict, the ALJ must investigate it and elicit a reasonable

explanation for the conflict before he can rely on the testimony of the VE. *Id.* at 1091-92.

Holden is correct that the ALJ did not ask the VE if her testimony was consistent with the

DOT, and the ALJ should have made this inquiry. *Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th

Cir. 2009). In *Poppa*, the Tenth Circuit reviewed the claimant's arguments that the VE's

testimony conflicted with the DOT, and the court rejected those arguments. *Id.* at 1173-74.

"Because there were no conflicts between the VE's testimony and the DOT's job descriptions, the ALJ's error in not inquiring about potential conflicts was harmless." *Id.* at 1174. Holden has not pointed to any conflict between the VE's testimony and the DOT's job descriptions. The undersigned finds the ALJ's error was harmless.

The undersigned finds no error at Step Five of the ALJ's decision.

**Credibility Determination**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In his decision, the ALJ found that Holden's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."[18] (R. 21). The ALJ gave several specific reasons for his credibility finding. *Id.* The ALJ's first reason for his credibility finding was Holden's sparse medical treatment. *Id.* It is entirely proper for the ALJ to consider Holden's infrequent medical contacts and infrequent attempts to obtain relief for his allegedly disabling impairments. *Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004); *Thompson,*

_____

[18] Holden faulted this language as meaningless boilerplate, but this sentence was merely an introduction to the ALJ's analysis and was not harmful. *See Kruse v. Astrue*, 2011 WL 3648131 at *6 (10th Cir.) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis").

987 F.2d at 1489 (frequency of medical contacts is one factor to consider in determining the credibility of pain testimony).

In his discussion of Holden's credibility, the ALJ also noted that no treating physician had placed functional restrictions on Holden that would interfere with his ability to work.  (R. 21).  Similarly, the ALJ recognized that no treating physician expressed concern about Holden's Hepatitis or his respiratory functioning.  *Id.*  The Tenth Circuit has affirmed decisions in which credibility was based in part on the fact that no treating physician had placed restrictions on the claimant.  *See, e.g., Boswell v. Astrue,* 2011 WL 6188724 at *2 (10th Cir.) (unpublished)*; Holden v. Astrue*, 274 Fed. Appx. 675, 686 (10th Cir. 2008) (unpublished).

The ALJ also discussed Dr. Hopper's findings, and that during Dr. Hopper's examination, Holden was able to move all extremities well, had no difficulty with fingering, had a maximum 5/5 grip strength, failed to mention hand/arm numbness, and with the exception of lumbar flexion, had normal range of motion.  (R. 21).  The ALJ's reliance upon the inconsistency between Dr. Hopper's examination and Holden's complaints is yet another specific reason for finding Holden less than credible.  Thus, the ALJ gave several specific, legitimate reasons for his finding that Holden was not fully credible, and his determination therefore complies with the legal requirements cited above.

Holden criticizes the ALJ's statement that his medical records were sparse, claiming he was unable to obtain medical care because he had no insurance and could not afford it.  Citing *Thompson*, 987 F.2d at 1490 (*quoting Frey*, 816 F.2d at 517), Holden argues the ALJ should have considered the following factors: whether treatment was prescribed, whether treatment would restore his ability to work, whether treatment was refused, and if so, whether the refusal was justifiable.  Plaintiff's Opening Brief, Dkt. #12, pp. 2-3.  Holden's reliance on *Thompson* is misplaced because *Thompson* dealt with the circumstance where the claimant had initially

pursued medical treatment and then stopped pursuing treatment, alleging an inability to afford it. 987 F.2d at 1489. Similarly, *Frey* dealt with the issue of refusal to follow prescribed treatment. 816 F.2d at 517; *Qualls*, 206 F.3d at 1372 (noting distinction). The Tenth Circuit has previously distinguished the issue of failing to pursue treatment, as discussed in *Thompson*, from the issue of infrequent medical contacts and said, "the determinative factor here is that there is no record in the administrative record that [claimant] has ever been diagnosed with a back problem that required any form of extensive evaluation or treatment." *Branum*, 385 F.3d at 1274. Likewise, here, the ALJ's credibility finding was not based on Holden's failure to pursue treatment. Rather, the ALJ's comment that Holden's medical records were sparse, was a legitimate factor supporting his credibility assessment. *Bales v. Astrue*, 374 Fed. Appx. 780, 783-84 (10th Cir. 2010) (unpublished) (lack of treatment for seven months before hearing was one legitimate factor supporting credibility assessment).

Although Holden claims he could not afford treatment for his allegedly disabling impairments, he did obtain medical treatment before, during, and after the relevant period for other, unrelated conditions. Notably, none of those medical records reflect the disabling pain Holden has claimed. For example, Holden had multiple routine and follow-up appointments with his primary providers to monitor his blood pressure, alcoholism, and sodium levels. (R. 215-19, 221-22, 299-304). None of those records reflect *any* complaints by Holden of numbness or pain in his back, legs, arms or hands, or of difficulty breathing. *Id.* Holden also sought emergency treatment for nausea, vomiting, dizziness, abdominal pain, and a hand injury, and none of those records reflect any of Holden's disabling pain complaints. (R. 270-73). Indeed, a medical record from May 15, 2007, reflects that Holden specifically denied muscle or joint pain, stiffness, backache, or limitation in range of motion. (R. 272). Even after the ALJ rendered his decision, Holden twice sought medical treatment for pneumonia and empyema, and these records

also do not reflect any complaints of Holden's alleged numbness or pain in his back, legs, arms, or hands. (R. 306-43, 378-85). Again, it was noted that Holden had no muscle weakness, joint stiffness, decreased range of motion, or numbness. (R. 310). On multiple occasions, Holden sought medical treatment, and during none of those occasions did he complain of the disabling pain and numbness he has alleged. The only occasions Holden complained of difficulty breathing were related to his treatment for pneumonia and empyema. Thus, Holden's arguments related to his inability to pay for treatment of his allegedly disabling impairments miss the mark and do not undercut the ALJ's reliance as part of his credibility assessment on Holden's sparse medical records.

Holden includes his assertion of positive factors that the ALJ should have mentioned, but did not: an observation by an agency clerk that Holden was nervous and anxious during an interview, limited activities of daily living, and no reports by medical providers that Holden exaggerated his symptoms. Plaintiff's Opening Brief, Dkt. #12, p 7. A claimant made a similar argument in a Tenth Circuit case, listing "certain pieces of favorable evidence." *Stokes v. Astrue*, 274 Fed. Appx. 675, 685-86 (10th Cir. 2008) (unpublished). The Tenth Circuit said that the only question it needed to consider was whether the ALJ's adverse credibility assessment "was closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion." *Id.* at 686. The Tenth Circuit found no reason to overturn the ALJ's credibility determination. *Id. See also Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir. 2009) (unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was not of such quality as to require discussion). This Court also finds that the ALJ's credibility assessment was closely and affirmatively linked to evidence that supported the conclusion that Holden was not fully credible.

Holden's multiple arguments regarding the ALJ's credibility assessment constitute "an

invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner," and the undersigned declines that invitation. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence). All of the arguments made by Holden essentially are that Holden would like for this Court to give more weight to the evidence that is in his favor and less weight to the evidence that disfavors his claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted). The undersigned finds no error in the ALJ's credibility assessment.

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 16th day of May, 2012.

Paul J. Cleary
United States Magistrate Judge